1

2

3

4

5

6

7

8                           **UNITED STATES DISTRICT COURT**

9                              **DISTRICT OF OREGON**

10                            **PORTLAND DIVISION**

11

12  **MICHAEL C. BUFFINGTON, JR.,**           )
                                              )
13                    Plaintiff,              )      03:10-cv-06346-HU
                                              )
14        vs.                                 )      **FINDINGS AND**
                                              )      **RECOMMENDATION**
15                                            )
    **MICHAEL J. ASTRUE,**                    )
16  Commissioner of Social Security,          )
                                              )
17                    Defendant.              )
18        _____

19

20  Kathryn Tassinari
    Mark A. Manning
21  Harder Wells Baron & Manning, P.C.
    474 Willamette, Suite 200
22  Eugene, OR 97401

23        Attorneys for Plaintiff

24  S. Amanda Marshall
    United States Attorney
25  Adrian L. Brown
    Assistant United States Attorney
26  1000 SW Third Avenue, Suite 600
    Portland, OR 97204-2902
27

28

                                    1

Leisa A. Wolf
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

HUBEL, Magistrate Judge:

    Michael C. Buffington, Jr. ("Buffington"), seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") disability payments under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1381 *et seq.* This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, I conclude that the Commissioner's decision should be **REVERSED** and **REMANDED** for further proceedings consistent with this Findings and Recommendation and the parameters provided herein.

## *I. PROCEDURAL BACKGROUND*

    Buffington protectively filed an application for SSI disability payments on August 7, 2008, claiming he was unable to work due to a schizoid disorder, post-traumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), and bipolar disorder. (Tr. 123-28, 134.) Buffington was ten years old on the alleged disability onset date of January 24, 2002. (Tr. 11, 134.)

    Buffington's application was denied initially on November 18,

FINDINGS AND RECOMMENDATION    2

2008, and upon reconsideration on April 2, 2009. (Tr. 7.)
Thereafter, a timely written request for hearing was filed on April
24, 2009. (Tr. 7.) Buffington appeared and testified at a hearing
held on August 20, 2009, before Administrative Law Judge ("ALJ")
James Yellowtail. (Tr. 7, 31.) The ALJ issued a decision denying
Buffington's claim for benefits on September 22, 2009. (Tr. 31.)
Buffington timely requested review of the ALJ's decision, which was
subsequently denied by the Appeals Council on August 26, 2010. (Tr.
1-3.) As a result, the ALJ's decision became the final decision of
the Commissioner that is subject to judicial review. (Tr. 1-3.)

## II. FACTUAL BACKGROUND

### A. Summary of the Medical Evidence, Consultants' Reports, and Written Testimony

Debora Doryon ("Doryon"), M.A., completed a Psychoeducational
Assessment Report on March 22, 2002. (Tr. 255-65.) Doryon's
assessment included the following "summary and conclusions":

> [Buffington] is an 11 year old fifth grade student who
> was recommended for this p[s]ychoeducational assessment
> as part of his three-year reassessment for special
> education services. Presently, he is identified as a
> student with an Emotional Disturbance and is receiving
> services in a Special Day Class. Based on this
> assessment, [Buffington] is a student of high average
> cognitive ability with strengths in oral vocabulary
> (SS=111) who is achieving at grade level in reading
> (SS=101), and slightly below grade level in spelling
> (SS=83) and math (SS=81). Standardized testing by the
> SDC Teacher indicates at least grade level performance[]
> in all academic areas except for spelling. . . .
> [Buffington] has numerous behavioral problems both in the
> school and in the home. These behaviors include defiance
> and disrespect to adult authority, argumentative comments

FINDINGS AND RECOMMENDATION        3

and outbursts.   There are also emotional indicators indicating a sense of persecution, aggression, anger and isolation.  Based on the above information, [Buffington] exhibits an inability to build or maintain satisfactory interpersonal relationships with peers and teachers and exhibits inappropriate types of behaviors under normal circumstances in several situations. **These characteristics have existed over a long period of time and to a marked degree and are not primarily due to** environmental, cultural, or economic disadvantage; unfamiliarity with the English language; limited school experience; poor attendance or social maladjustment; **mental retardation**; or visual, hearing or motor impairment.  Based on these results, [Buffington] continues to meet the eligibility criteria of Emotional Disturbance.

(Tr. 261) (emphasis added).

In late November 2005, mental health specialist Loree Holmes ("Holmes"), M.A., completed a Comprehensive Mental Health Assessment on Buffington.[1]  (Tr. 355-58.)  The November 2005 Mental Health Assessment provided the following "Clinical Formulation":

[Buffington] is a 14 year old male who has been in psychiatric treatment since 1996, and has had hallucinations and heard voices since 1999.  When he is not on his medications he is a threat to others, as ordered by his voices.  In addition, he has been a victim of sexual molestation.  Diagnostically [Buffington] presents with psychotic symptoms which suggests a possible schizoaffective disorder. [Buffington] also has an abuse history and evidences signs of Posttraumatic Stress Disorder (nightmares & unresolved treatment issues).  Treatment should include individual and medication therapy, and will be on-going.  I expect his psychotic symptoms to remain in remission as long as he takes his medication.

(Tr. 357.)  The November 2005 Mental Health Assessment references

_____

[1]   The November 2005 Mental Health Assessment prepared by Holmes was reviewed and approved by Bazil Freedman, Ph.D. (Tr. 358.)

FINDINGS AND RECOMMENDATION      4

Axis I diagnoses of: "Schizoaffective Disorder, Depressed"; "Posttraumatic Stress Disorder"; and "Adjustment Disorder w/Mixed Anxiety and Depressed Mood." (Tr. 357.)

On December 9, 2005, Buffington met with Bazil Freedman ("Freedman"), Ph.D., for further psychiatric evaluation. (Tr. 353-54, 358.) Buffington's auditory and visual hallucinations reportedly were "no longer occurring and are [] absent as long as he stays on his medication regimen." (Tr. 353.) While Buffington's medications were described as a "great benefit to him," his family also reported that his medications seem to impact his motor skills, *e.g.*, he has difficulty tying his shoelaces and writing legibly. (Tr. 353.) Freedman described Buffington as a patient with "significant mental health history that includes at least three or possibly four psychiatric hospitalizations, three of which occurred in the year 2000." (Tr. 353.) He also noted that Buffington "has been in some form of treatment or therapy since the age of six years old." (Tr. 354.) Freedman's diagnostic impression included Axis I diagnoses of: "Schizoaffective Disorder"; "History of PTSD"; and "History of Depression." (Tr. 354.)

Buffington saw Holmes for therapy on December 12, 2005. (Tr. 352, 358.) During that consultation, Holmes provided Buffington with the following objectives: "successfully stay home alone for two hours at a time, two times per month"; "take care of [your] personal hygiene, without help/reminders from mom, 90% of the

FINDINGS AND RECOMMENDATION    5

time"; "make at least one new friend at school by June 2006"; "resort to violent outbursts 0% of the time . . . [and] seek help if the voices re-emerge immediately"; and "[a]ssist family in accessing appropriate treatment services." (Tr. 352.)

On September 13, 2006, psychiatrist Jerome Vergamini ("Vergamini"), M.D., provided Buffington a note for school, which indicated that "[Buffington] is taking medications that may require him to go to the bathroom more frequently. Please give him permission to use the bathroom as frequently as he needs to go." (Tr. 351.)

On December 4, 2006, Holmes completed an Annual Comprehensive Mental Health Assessment of Buffington.[2] (Tr. 348-50.) Holmes' assessment indicates that Buffington "denied any visual or auditory hallucinations" or "suicidal or homicidal ideation." (Tr. 349.) Holmes described Buffington as an individual "of low-average intelligence with poor insight and judgment." (Tr. 349.) Holmes provided the following "overview of treatment" since Buffington's last assessment:

> [Buffington] has been in treatment at Lane County Mental
> Health since 11/23/05. He has received individual and
> family therapy, as well as medication management. He
> came to the clinic with diagnoses of ADHD, PTSD,
> Depression, Schizophrenia, Schizoaffective Disorder and
> possibly others. . . . He was initially in treatment with
> Bazil Freedman, M.D., who, after about three months,
> changed his diagnosis to that of an Anxiety Disorder with

---

[2] The December 2006 Annual Comprehensive Mental Health Assessment was reviewed and approved by Vergamini. (Tr. 350.)

FINDINGS AND RECOMMENDATION    6

some obsessive-compulsive features. **At that time, he also reported that [Buffington]'s self-reported hallucinatory activities did not appear to be true hallucinations. . . . Even though he was making progress in becoming more independent and less volatile, both [Buffington] and his mother continued to be strongly invested in [Buffington] being an individual with 'psychosis', which is to say a person with severe and persistent mental illness.** In May 2006, Michael changed doctors and began to see Jerome Vergamini, M.D. . . . His explosive outbursts occur only rarely, and he no longer hears voices or reports he has an 'evil side'. . . . Current presenting problems include his inability and/or unwillingness to grow-up and work towards becoming independent. He resents have to awaken and take care of himself in the morning. This is a 15 year 8 month old male who asks his parents what he should wear, and need reminders to dress, brush his teeth and comb his hair.

(Tr. 348) (emphasis added). The December 2006 Mental Health Assessment references Axis I diagnoses of: "Generalized Anxiety Disorder with Obsessive-Compulsive Symptoms." (Tr. 349.)

Buffington saw Vergamini on December 11, 2006, and January 19, 2007. (Tr. 346-47.) Vergamini's progress notes from those sessions refer to Buffington as having "a previous diagnosis of Schizoaffective Disorder." (Tr. 346-47.)

On February 14, 2007, Buffington saw Vergamini and reported that he was "doing well" and had only had a few minor "blowups." (Tr. 344.) Buffington saw Vergamini on March 5, 2007, and Vergamini reported Buffington was having "some problems coming off of Paxil," such as increased mood swings and feeling depressed. (Tr. 341-42.) However, Buffington was "doing much better" after he was put back on Paxil. (Tr. 342.) Overall, in Vergamini's

FINDINGS AND RECOMMENDATION    7

opinion, Buffington "seems to be functioning fairly well on Abilify 30 mg a day, Paxil 5 mg a day, and Lamictal 150 mg a day." (Tr. 342.)

Buffington met with Vergamini on April 2, 2007, and reported difficulties with school and his temper. (Tr. 341.) Vergamini's progress notes indicate Buffington tried "to get [his stepfather] to fight with him" and that "motivational problems persist around" Buffington's Algebra I math class, which he "feels is too difficult for him." (Tr. 341.)

Buffington visited Steven Yoder ("Yoder"), M.D., at the Family Practice Clinic on April 24, 2007, regarding his asthma, dorsal back pain, and foot pain. (Tr. 268-69.) Yoder instructed Buffington to use appropriate asthma medications; set him up with an allergist; advised him to use ibuprofen for any pain; and referred him to a "podiatrist for evaluation regarding the possible need for orthotics." (Tr. 268-69.)

On May 5, 2007, Buffington saw Vergamini for a consultation. (Tr. 340.) Buffington was brought in by his stepfather and mother, Susan Castleberry ("Castleberry"), who reported that Buffington had "been very anxious and throwing up in the mornings." (Tr. 340.) Buffington's parents attributed this to his anxiety. (Tr. 340.) Castleberry also reported that "he tends to have problems with hearings voices" when he doesn't take Abilify. (Tr. 340.)

Vergamini's June 20, 2007 progress notes indicate that

FINDINGS AND RECOMMENDATION    8

Buffington "has been doing well on Abilify 30 mg daily and Lamictal 150 mg daily. . . . He is out of school but will be taking some Summer classes to make up some algebra for about three weeks this Summer." (Tr. 339.)

On June 21, 2007, Buffington saw Yoder because of an increased cough that produced greenish phlegm and a sore throat. (Tr. 266.) Yoder placed Buffington on "Flovent 44". (Tr. 266.)

Vergamini's July 19, 2007 progress notes indicate that Buffington "generally [has] been doing fairly well except that he gets into it with his mother and [his stepfather] indicates that he gets nose to nose with her at times." (Tr. 338.) Vergamini asked Buffington to sign a contract stating, "I will respect my mother and let her help me with my homework and not give her a hard time." (Tr. 338.) Buffington obliged and requested "medication that would calm him down at those times when he is starting to get pretty angry." (Tr. 338.)

On August 15, 2007, Buffington visited Vergamini for a consultation. (Tr. 337.) Vergamini's progress notes indicate that Buffington did not have any "blowups" after signing the July 2007 contract, although he did utilize prescribed medication two or three times to "calm[] things [] down." (Tr. 337.)

Vergamini's September 19, 2007 progress notes indicate Buffington was "doing well at getting up, going to school, and getting his medication in before he goes. He has had no

meltdowns." (Tr. 336.)  At that time, Buffington was in eleventh grade and was "a teacher's assistant in a couple of classes." (Tr. 336.)  Buffington reported that "[h]e likes school and is very positive about his experience there this year.  He is ahead in credits but will have one more year of school after this." (Tr. 336.)

Buffington visited Vergamini on October 29, 2007, along with Castleberry and his stepfather.  (Tr. 335.)  Vergamini's progress notes indicate that:

> Things are going reasonably well.  He is getting 'B's' at school but he talks about having a lot of anxiety at school too.  He has got a fine tremor, which seems to get worse in situations where he is under stress.  Apparently, he has had enough anxiety at school that he gets nauseated and has to go to the nurse a lot.  The anxiety usually centers around school, both in class and doing homework around friends.

(Tr. 335.)  As a result, Vergamini decided to prescribe Buffington "buspirone 15 mg twice a day."  (Tr. 335.)

On October 30, 2007, Holmes completed an Annual Comprehensive Mental Health Assessment of Buffington.[3]  (Tr. 332-33.)  At that time, Buffington had "made good progress on all of his goals"; had "become quite independent and social"; stayed "home alone"; and had "developed a network of neighborhood friends." (Tr. 332.) However, Buffington continued to need "lots of prompting in the morning to get up, get dressed and get out the door to school on time"; and

---

[3]   The October 2007 Annual Mental Health Assessment was reviewed and approved by Vergamini.  (Tr. 333.)

FINDINGS AND RECOMMENDATION     10

continued to need "support and encouragement in social skill development." (Tr. 332.) Buffington reported that his biggest concern was anxiety related to social pressure and feeling incompetent, which results in "emotional meltdowns" at school and vomiting. (Tr. 332.) According to Holmes, Buffington is "quite bright" and "is currently maintaining a B+ average in the 11[th] grade[.] . . . He is on an [Independent Education Program], but is mainstreamed for most of the day." (Tr. 333.) During Holmes' interview, Buffington denied any visual hallucinations, but did "report hearing voices again" that "say 'evil things.'" (Tr. 333.)

The October 2007 Mental Health Assessment references Axis I diagnoses of "Generalized Anxiety Disorder" and "Schizoaffective Disorder." (Tr. 333.) Holmes' clinical formulation states, "[Buffington] experiences excessive anxiety and worry in several areas of his life. He also experiences hallucinations and disorganized speech. He benefits from medication management, and could benefit from a skill builder to help with social skill building, as well as on-going therapy." (Tr. 333.)

On November 21, 2007, Buffington saw Vergamini and reported going to Urgent Care recently because he was experiencing dizziness; lost feeling and use of his lower extremities; and lost vision in both eyes. (Tr. 330.) Buffington also reported "he has had headaches, nausea, and sees sparkling lights at times." (Tr. 330.) According to Vergamini, Buffington claimed "[t]his has been

FINDINGS AND RECOMMENDATION      11

going on for about a year and [a] half but he has neglected to tell me up until now." (Tr. 330.) Vergamini suggested that Buffington cease taking "Abilify for the next week to see how he does without that medication." (Tr. 330.)

On November 28, 2007, Buffington visited Vergamini and reported difficulties with his vision. (Tr. 328.) Vergamini found "there a quality to this that made [him] wonder about how much [of it] was psychogenic." (Tr. 328.)

Buffington's next visit with Vergamini was on January 4, 2008. (Tr. 326.) At that time, Buffington was "more depressed," irritable, and was "giving his parents a tougher time" after being off of Abilify. (Tr. 326.) Vergamini noted that he took Buffington off of Abilify because he was experiencing dizziness, headaches, and "feeling overly subdued." (Tr. 326.) Vergamini found Buffington "somewhat giddy and a little inappropriate in terms of his interactions and reverting to more childlike banter and some of the things that I saw initially with him." (Tr. 326.) Vergamini referred to Buffington "as a young man with a Shizoaffective diagnosis." (Tr. 326.) Because Buffington's parents did not feel a lower dosage of Abilify would be effective, Vergamini prescribed Buffington Seroquel. (Tr. 326.)

Buffington returned to Vergamini's office on January 16, 2008, and reported that the Seroquel was not producing desired results. (Tr. 325.) Castleberry reported that Buffington was "too sedated"

FINDINGS AND RECOMMENDATION    12

on the medication and said he couldn't feel his legs. (Tr. 325.) Castleberry put him back on Abilify and reported that he was doing much better. (Tr. 325.)

On February 13, 2008, Buffington saw Vergamini, who stated, "Buffington looks as though he is back to the level he was at before deteriorating a bit earlier in the year or later in the fall. He looks reasonably stable on his medications." (Tr. 324.) Overall, Buffington was described as "a young man who is Schizoaffective but fairly stable at this point." (Tr. 324.)

On March 10, 2008, Castleberry reported to Vergamini "that things are going fairly well" and that he "is pretty well stabilized on the [current] medication." (Tr. 323.)

Buffington had a follow up visit with Vergamini on April 25, 2008. (Tr. 322.) Buffington reported that "things are going fairly well" and he "only threw up twice" since the last time Vergamini saw him. (Tr. 322.)

On June 6, 2008, Buffington saw Vergamini and reported recently breaking his right wrist playing football. (Tr. 321.) Buffington was again described as "a young man with Schizoaffective Disorder who is fairly stable at this point on his medications, namely Abilify 15 mg twice a day and Lamictal 75 mg twice a day." (Tr. 321.)

Vergamini's July 23, 2008 progress notes indicate that Buffington passed all of his junior year classes and his "Mom wants

FINDINGS AND RECOMMENDATION    13

to get him back on SSI so that he can get Oregon Health Plan again so that she can better afford his prescriptions." (Tr. 320.)

Castleberry completed a Function Report- Child on August 7, 2008. (Tr. 141.) Castleberry indicated that Buffington's speech can be understood by people who know him "[m]ost of the time" and by people who don't know him well "[s]ome of the time." (Tr. 142.) Castleberry observed that Buffington "[h]as had problems with [his] medication mak[ing] his vision blurry." (Tr. 143.) Castleberry stated that Buffington had difficulty hearing because of "delayed responses," which she attributed to "possible autism."[4] (Tr. 143.)

Castleberry indicated that Buffington is capable of: answering the telephone and making telephone calls; delivering phone messages; repeating stories he has heard; telling jokes or riddles accurately; explaining why he did something; using sentences with "because," "what if," or "should have been"; asking for what he needs; talking with family; and talking with friends. (Tr. 144.) Additionally, Castleberry observed that Buffington is capable of: reading and understanding sentences in comics and cartoons; reading and understanding stories in books, magazines, or newspapers; spelling words of more than 4 letters; telling time; adding and substracting numbers over 10; multiplying and dividing numbers over 10; understanding money/ making correct change; and understanding,

---

[4] There is no record of anyone evaluating Buffington as being autistic other than this stray comment by Castleberry.

FINDINGS AND RECOMMENDATION    14

carrying out, and remembering simple instructions. (Tr. 145.)

In terms of Buffington's physical abilities, Castleberry stated that he can walk; run; dance; swim; ride a bike; throw a ball; jump rope; play sports; and work video game controls. (Tr. 145.) However, Buffington cannot drive a car and "has been in adaptive [p]hysical education because of his flat feet." (Tr. 145.) Buffington's flat feet are only problematic "if it is too hot outside." (Tr. 145.)

Castleberry indicated that Buffington's impairments have affected his social activities. (Tr. 146.) Specifically, Buffington has no friends his own age; cannot make new friends; and cannot not play team sports. (Tr. 146.) However, Buffington does get along with Castleberry, other adults, his siblings, and school teachers. (Tr. 146.) Castleberry explained that, "[u]sually [he] gets along with me and other adults but there have been conflicts, usually when he is having hallucinations-- he has had multiple personalities. Medications help but not completely. He hear[s] voices that have told him to hurt me. He can change in an instant and become violent." (Tr. 146.)

As to Buffington's ability to take care of his personal needs, Castleberry observed that he doesn't: take care of his personal hygiene; wash and put away his clothes; take needed medication; use public transportation by himself; or accept criticism or correction. (Tr. 147.) But Buffington is able to: help around the

FINDINGS AND RECOMMENDATION    15

house; cook a meal for himself; get to school on time; study and complete homework assignments; keep himself out of trouble; obey rules; avoid accidents; and ask for when help when needed. (Tr. 147.)

In terms of Buffington's "ability to pay attention and stick with a task," Castleberry reported that Buffington is able to work on arts and crafts projects; finish things he starts; and complete chores most of the time.  (Tr. 148.)  But Buffington experiences difficulty when it comes to keeping busy on his own; completing homework; and completing homework on time.[5]  (Tr. 148.)

On August 12, 2008, mental health specialist Brian Alexander ("Alexander"), M.A., provided a progress note that indicates Buffington was no longer eligible for Oregon Health Plan ("OHP") benefits since Castleberry's income was "too high."  (Tr. 319.) However, in August 2008, Castleberry "was not working because she ha[d] been diagnosed with [] cancer."  (Tr. 319.)

During Buffington's August 20, 2008 visit with Vergamini, he reported that things were going well over the summer and expressed interest in returning for his senior year of high school.  (Tr. 318.)

Phyllis Goldman ("Goldman") completed a Teacher Questionnaire on September 19, 2008. (Tr. 160-67.)  Goldman has known Buffington

---

[5] Castleberry appears to contradict her testimony regarding Buffington's ability to do homework.  (*See* Tr. 147 vs. Tr. 148.)

for two years and spends approximately five hours a week with him. (Tr. 160.)  Goldman confirmed that Buffington has exhibited an "unusual degree of absenteeism" and that he "gets stuck a lot, [which] usually means he is stressed out [and] doesn't want to do [] work." (Tr. 160.)

The questionnaire first asked Goldman to provide ratings based on ten activities which are used to evaluate Buffington's ability to acquire and use information. (Tr. 161.) Goldman indicated that Buffington has "no problem" with understanding and participating in class discussions; and providing organized oral explanations and adequate descriptions. (Tr. 161.) He has a "slight problem" with understanding school and content vocabulary; reading and comprehending written material; learning new material; and recalling and applying previously learned material. (Tr. 160.)

Goldman believes Buffington has "an obvious problem" with comprehending oral instructions; and expressing ideas in written form. (Tr. 161.) He also has "a serious problem" with comprehending and doing math problems; and applying problem-solving skills in class discussions. (Tr. 161.)  Goldman stated that Buffington "[r]arely will do work independently. [He] [w]ants someone telling him what to do every step of the way even though he can do [it] on his own." (Tr. 161.)

Next, Goldman rated thirteen activities which are used to

evaluate Buffington's ability to attend and complete tasks.[6] (Tr. 162.) Goldman opined that Buffington has no problem paying attention when spoken to directly and only a slight problem changing from one activity to another without being disruptive. (Tr. 162.) He has an obvious problem with refocusing to task when necessary; carrying out multi-step instructions; waiting to take turns; and working without distracting himself or others. (Tr. 162.) Buffington has a serious problem focusing long enough to finish an assigned activity or task; organizing his own things or school materials; completing class/homework assignments; and completing work accurately without careless mistakes. (Tr. 162.)

As to interacting and relating with others, Goldman observed that Buffington "has problems functioning in this domain." (Tr. 163.) Specifically, Goldman indicated that Buffington has an obvious problem with making and keeping friends; appropriately seeking attention; and expressing anger appropriately. (Tr. 163.) He has a slight problem playing cooperatively with other children; respecting/obeying adults in authority; relating experiences and telling stories; taking turns in a conversation; interpreting the meaning of facial expressions; and using adequate vocabulary and grammar to express thoughts and ideas. (Tr. 163.) However, Buffington has no problem asking for permission appropriately;

---

[6] Goldman did not provide a rating with respect to Buffington's ability to sustain attention during play/sports activities or work at a reasonable pace/finish on time. (Tr. 162.)

following rules; using language appropriate to the situation and
listener; or introducing and maintaining relevant and appropriate
topics of conversation.  (Tr. 163.)

With respect to Buffington's ability to move about and
manipulate objects, Goldman observed that he has no problems in
this domain and that his functioning appears age-appropriate. (Tr.
164.)

Buffington's ability to care for himself was the only domain
that Goldman rated Buffington as having a "very serious problem"
with certain activities.  (Tr. 165.)  Those activities included
Buffington's ability to respond appropriately to changes in his
mood (e.g., calming himself down); and his ability to use
appropriate coping skills to meet the daily demand of the school
environment.  (Tr. 165.)  Goldman rated Buffington as having a
serious problem handling frustration appropriately; and an obvious
problem with being patient, identifying and appropriately asserting
emotional needs, and knowing when to ask for help.[7]  (Tr. 165.)
Buffington was deemed to only have a slight problem caring for
physical needs (e.g., dressing, eating), and using good judgment
regarding personal safety and dangerous circumstances.  (Tr. 165.)

Lastly, as to Buffington's medical conditions and physical
well-being, Goldman indicated that Buffington "throws up often";

---

[7] Goldman specifically said Buffington "asks for too much
help."  (Tr. 165.)

FINDINGS AND RECOMMENDATION    19

however, she also emphasized that this has always been "self reported, not observed." (Tr. 166.)

On September 22, 2008, Buffington told Vergamini that "[h]e is a little worried about school because he finds himself not very assertive with teachers and then ends up feeling somewhat victimized." (Tr. 317.) Vergamini worked with Buffington on "some assertive techniques." (Tr. 317.) Buffington was accompanied by Castleberry and his case manager, Alexander, who was planning on attending Buffington's upcoming Independent Education Program ("IEP") meeting. (Tr. 317.)

On October 2, 2008, Alexander was present at Buffington's IEP meeting, along with Castleberry, his stepfather, and special education teacher Goldman. (Tr. 316.) During the IEP meeting, it was noted that Buffington was currently passing all his classes; the number of his anxiety-related absences had reduced; he was currently on track to graduate with a regular diploma; Goldman said "he is a delight to be around, everyone likes him and he seems to like everyone"; and Buffington was described as "bright, highly social, honest, kind, good sense of humor, and has good insight." (Tr. 316.)

Alexander's October 2, 2008 progress notes indicates that Buffington's IEP "is for Emotional Disturbance" and that he "receives behavioral support, extended test taking time, alternate location[s] for taking exams, and shortened assignments."

FINDINGS AND RECOMMENDATION     20

(Tr. 316.)

On October 2, 2008, Bethel School District submitted a record regarding Buffington's present level of academic achievement, which indicates that Buffington passed "the 10th grade state reading assessment, but did not pass writing, math or science." (Tr. 198.)

On October 20, 2008, Buffington had a follow up visit with Vergamini. (Tr. 315.) Vergamini noted that Buffington was "doing well in school and is well liked by his peers and teachers." (Tr. 315.) At that time, Buffington was still "taking Abilify 15 mg twice a day and Lamictal 150 mg half a tablet twice a day." (Tr. 315.)

On October 27, 2008, Alexander completed an Annual Comprehensive Mental Health Assessment of Buffington.[8] (Tr. 313-14.) The October 2008 Mental Health Assessment references Axis I diagnoses of "Generalized Anxiety Disorder" and "Schizoaffective Disorder." (Tr. 314.) Alexander's clinical formulation states:

> [Buffington] continues to need some prompting in the morning to get up, get dressed and get out the door to school on time, though there has been significant improvement in this area. He continues to require support and encouragement in social skill development although some improvement is noted by parents and school. [Buffington] still experiences anxiety related to school and social interactions, though his anxiety related absences have reduced, and his pe[e]r relations have improved. [Buffington] is currently passing all his classes and is currently on track to receive a regular diploma. His teachers and others within the school find

---

[8] The October 2008 Mental Health Assessment was reviewed and approved by Vergamini on October 29, 2008. (Tr. 314.)

> him to be a 'delight to be around.' They acknowledge he
> has grown up a lot in the past year. He is also doing
> better with transitions, though this is an area which
> still needs improvement.

(Tr. 314.)

Paula Belcher ("Belcher"), Ph.D., completed a Psychological Assessment on November 8, 2008. (Tr. 292-98.) Buffington was referred to Belcher "for a comprehensive psychodiagnostic exam by the Disability Determination Services to assess schizoid personality disorder, obsessive-compulsive disorder, posttraumatic stress disorder, and bipolar disorder and to determine eligibility for services." (Tr. 292.) Buffington reported to Belcher that "he is depressed, hears voices, has visual hallucinations, and has experienced trauma, citing the death of his father before age 7." (Tr. 293.) Belcher's report indicates that, "[h]e said his father died in prison, and 'everyone' said it was suicide, but the client believes he was murdered, because, he said, '[m]y dad was in a wheelchair and could not reach the bar they said he hung himself from.'" (Tr. 294.)

During her assessment, Belcher administered the Weschler Adult Intelligence Scale-IV ("WAIS-IV") test, which is used to measure various cognitive abilities. (Tr. 296.) Buffington earned a score of 80 on Verbal Comprehension, "placing him at the 9th percentile and in the low average range." (Tr. 297.) He earned a score of 73 on Perceptual Reasoning, "placing him at the 4th percentile and in the borderline range." (Tr. 297.) He earned a score of 60 on

Working Memory, "placing him at the 0.4 percentile and in the extremely low range." (Tr. 297.) He earned a score of 56 on Processing Speed, "placing him at the 0.2 percentile and in the extremely low range." (Tr. 297.) Overall, Buffington's scores yielded a Full Scale IQ of 63, "placing him at the 1st percentile and in the extremely low range of general intellectual functioning when compared to persons his age." (Tr. 297.) Belcher opined that there is a 95% probability that Buffington's true IQ lies between 60 and 68. (Tr. 297.)

Based on her diagnostic interview and mental status exam, Belcher offered the following hypotheses: (1) "a diagnosis, confirming that of the client's psychiatrist, of schizoaffective disorder, bipolar type, is given"; (2) "[w]hile the client experiences some anxiety and compulsive behaviors, they are not sufficient to warrant a diagnosis of PTSD or OCD"; (3) "[t]he client does not have a diagnosis of schizoid personality disorder"; and (4) "[t]he client's intellectual functioning is in the extremely low range, resulting in a diagnosis of mild mental retardation. His individual strength in vocabulary serves him in his ability to communicate verbally with others, thereby somewhat disguising some of his cognitive deficits." (Tr. 298.)

On November 17, 2008, non-examining state agency psychiatric consultant Charles Lawrence ("Lawrence"), Ph.D., prepared a Childhood Disability Evaluation Form. (Tr. 299-304.) Lawrence

FINDINGS AND RECOMMENDATION   23

opined that Buffington did not suffer from a severe impairment or combination of impairments that is severe. (Tr. 299.) Lawrence noted that the "10/30/07 annual assessment by the mental health treating agency confirms long term psychiatric stability, becoming 'quite independent and social . . . [, with a] network of neighborhood friends.' That report also shows that the adolescent is 'quite bright . . . maintaining a B+ average in the 11th grade.'" (Tr. 304.) In Lawrence's opinion, "[o]ne would not guess that this is the same person evaluated by P. Belcher, Ph.D. on 11/08/08. In that exam the claimant presented as being unable to perform serial 7's or serial 3's, unable to spell 'WORLD', and he obtained a FSIQ of 63 on the WAIS III." (Tr. 304.) Lawrence went on to state, "[u]nfortunately Dr. Belcher neglected to confirm a history of developmental delay and deficits of adaptive behavior before advancing the diagnosis of Mental Retardation. She merely cited the IQ scores, as if no other confirming evidence was required." (Tr. 304.) Lawrence concluded by stating:

> [The claimant] was 'ahead in his credits' (for graduation) per the psychiatric progress note of 09/19/07, and the longitudinal school records show he has been achieving at age/grade level for many years. The adolescent also told Dr. Belcher he had been hearing a voice telling him 'they must die' and was thinking of suicide a lot. Those allegations conflict with the tx records. CONCLUSION: The claimant did not cooperate in the exam process with Dr. Belcher. That report will be given no weight. The longitudinal records of mental treatment and school performance and behavior document no important limitations. NON-SEVERE.

(Tr. 304.)

FINDINGS AND RECOMMENDATION     24

On January 12, 2009, Buffington returned to Vergamini's office for a consultation. (Tr. 311.) Vergamini's progress notes indicate that Buffington had been "turned down by Social Security." (Tr. 311.) Because Buffington was no longer on the OHP, Vergamini made efforts to get Buffington "enough samples of Abilify and Lamictal to get us through about a month." (Tr. 311.)

On February 18, 2009, Buffington visited Vergamini and reported that he was considering joining a writing group, and that he was having trouble sleeping. (Tr. 310.) Buffington was still receiving samples of his medications because he was "not covered by any kind of insurance." (Tr. 310.)

On March 30, 2009, non-examining state agency psychiatric consultant, Bill Hennings ("Hennings"), Ph.D., prepared a Childhood Disability Evaluation Form on Buffington. (Tr. 359-64.) Hennings concluded that Buffington suffers from impairment(s) that are severe, but do not meet, medically equal, or functionally equal a listing. (Tr. 359.) With respect to functional equivalence, Hennings evaluated Buffington's capabilities under six domains of functioning. (Tr. 361.) He opined that Buffington has less than marked limitations in acquiring and using information; attending and completing tasks; interacting and relating with others; and caring for himself. (Tr. 361-62.) He opined that Buffington had no limitation with respect to moving about and manipulating objects, or health and physical well-being. (Tr. 361-62.) In

FINDINGS AND RECOMMENDATION     25

support of his findings, Hennings noted that Belcher's IQ testing was invalid "per Dr. Lawrence." (Tr. 364.)

On April 2, 2009, Hennings prepared a Psychiatric Review Technique Form, wherein he evaluated Buffington's impairments under Listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). (Tr. 369.) He concluded that the limitations imposed by Buffington's impairments did not satisfy the requisite criteria of Listings 12.02, 12.04, or 12.06. (Tr. 379-80.)

On April 2, 2009, Hennings submitted a Mental Residual Functional Capacity Assessment, which describes Buffington as "[m]oderately [l]imited" in six of twenty categories of mental activity and "[n]ot [s]ignificantly [l]imited" in fourteen. (Tr. 383-84.) Hennings' conclusion states:

> Claimant has a history of anxiety in social setting[s], some compulsions and need for behavioral support in scholastic setting. He is capable of carrying out simple tasks with regular supervision. He will work best in an environment with infrequent and restricted/directed interactions with coworkers or the general public. He has a history of oppositional behaviors and will benefit from a supervisor aware of his attitudes who can provide feedback in an acceptable manner.

(Tr. 385.)

On April 3, 2009, Buffington had an individual therapy session with Alexander and was accompanied by Castleberry. (Tr. 391.) Castleberry reported that Buffington had "been struggling with increased audio and visual hallucinations in the past week or so."

FINDINGS AND RECOMMENDATION    26

(Tr. 391.)  Buffington did not attend school that day.[9]  (Tr. 391.)

On April 7, 2009, Buffington reported to Alexander that he had "been very stressed lately" and that his medications were not working very well.  (Tr. 391.)

Vergamini's April 27, 2009 progress notes reference the fact that Buffington received "an ECMC scholarship which pays [] $4,000 for the first year of college and $2,000 the second."  (Tr. 390.) At that time, Buffington was planning on attending Lane Community College ("LCC") in the fall and to apply for a job at the high school bakery.  (Tr. 390.)

In the April and May 2009 progress notes, there is an undated report from either Vergamini or Alexander, which indicates that Buffington was experiencing increased audio and visual hallucinations.[10]    (Tr. 390.)   Buffington characterized his hallucinations as "grim" and that "the auditory ones are usually something like 'kill, kill, kill, die, die, die . . .'"  (Tr. 390.) Buffington's visual hallucinations are "images or figures which are trying to attack him, such as a large version of the Energizer Bunny."  (Tr. 390.)  Buffington said "most of his stress come[s] from school and how he feels other students don't treat everyone

_____

[9] The record suggests Buffington was taking his medications appropriately at this time.

[10] It appears that the heading of this progress note was cut off, because the text does not appear to coincide with the language from the preceding page.  (*See* Tr. 389-90.)

FINDINGS AND RECOMMENDATION    27

with respect." (Tr. 390.) Buffington agreed to engage in therapy for a brief period to learn stress reduction techniques in order to alleviate "increased psychotic symptoms." (Tr. 390.)

On May 1, 2009, Buffington saw Alexander for an individual therapy session. (Tr. 389.) According to Alexander, Buffington presented himself in a "very manic and upbeat" manner. (Tr. 389.) Buffington denied hearing voices or having visual hallucinations at that time. (Tr. 389.)

During Buffington's May 12, 2009 individual therapy session, Alexander inquired as to whether Buffington "was manic because he was talking non-stop in a hurried fashion." (Tr. 389.) Buffington denied being manic and denied having any delusions or hallucinations. (Tr. 389.)

On May 28, 2009, Alexander met with Buffington and Castleberry. (Tr. 389.) Castleberry had recently been hospitalized, but Buffington managed "his stress levels and avoided severe psychotic symptoms." (Tr. 389.)

On July 7, 2009, Buffington's counsel sent Vergamini a letter asking him to comment on Buffington's "present status and functional capacities limitations." (Tr. 393.) Vergamini responded on July 22, 2009, reiterating the fact that Buffington suffers from a Schizoaffective Disorder, and experiences "auditory hallucinations, explosive behavior, difficulties with school and peer relationships." (Tr. 394.) In Vergamini's opinion, "with his

FINDINGS AND RECOMMENDATION     28

medications he might be able to function in school or some work settings"; however, he doubted whether "he could maintain 8hours/day 5days/week without some accomodations or absences." (Tr. 394.)

On July 22, 2009, Vergamini also completed a questionnaire concerning Buffington's mental residual functional capacity. (Tr. 396.) Vergamini described Buffington as moderately limited in twelve of twenty categories of mental activity and not significantly limited in eight. (Tr. 397-99.) In Vergamini's opinion, these limitations have lasted twelve continuous months and/or can be expected to last twelve continuous months at the assessed severity. (Tr. 399.)

### B. Buffington's Hearing Testimony

During the August 20, 2009 hearing before the ALJ, Buffington testified that he had recently graduated and had applied to LCC. (Tr. 40.) Buffington indicated that he was in special education all four years of high school, and had been in special education classes "[a]lmost all [his] life." (Tr. 41, 58.) Buffington testified that he missed school at least three times a month on average because of anxiety-related symptoms. (Tr. 60.)

Buffington stated that his penmanship is not legible and he types slowly, but he is good at mathematics. (Tr. 41-42.) Although chart notes referenced Buffington joining a chess club and writing group, he confirmed that this never took place. (Tr. 59.)

FINDINGS AND RECOMMENDATION     29

Buffington testified that he started Abilify in 2003 "at a mental institution" in order to stop his "bipolar" and "schizoaffective tendencies," such as auditory and visual hallucinations. (Tr. 45.) Buffington indicated that Abilify impacts his vision, ability to speak, and write. (Tr. 46.) Lamictal causes him to have tremors. (Tr. 46.)

Buffington stated that his medications "help but they're no cure . . . [and] they don't help as much as I think they should." (Tr. 47.) In fact, Buffington believes he does "most of the work [him]self." (Tr. 47.)

Buffington believes that "stress" would prevent him from being employed. (Tr. 48.) He testified that:

> I've had multiple episodes of stress, manic episodes because of the stress at my house and my -- and at school. And I -- [if] this was at work I would have the same problems because, you know, I don't want to flip out, you know. I mean, I am -- I try to be peaceful. I mean, stress just gets me really bad.

(Tr. 48.) When Buffington is stressed, he becomes agitated and has "problems in [his] head," such as "hearings things that aren't there. If it gets [bad] enough my head starts to hurt really bad and they start screaming at me. And then that's when I start seeing things." (Tr. 49.) Buffington tries to utilize stress reduction techniques in order to alleviate his psychotic symptoms. (Tr. 49.)

Buffington stated that he has to leave school often because he

FINDINGS AND RECOMMENDATION    30

vomits or faints. (Tr. 52.) After school, Buffington often times goes straight to his room since it is the only place he "think[s] straight." (Tr. 53.) His hobbies consist of writing poetry on the computer. (Tr. 53.) Buffington indicated that he has difficulty following instructions and staying focused. (Tr. 57.)

### C. Castleberry's Hearing Testimony

On August 20, 2009, Castleberry testified at the hearing before the ALJ as well. (Tr. 66.) Castleberry indicated that Buffington was in special education classes in elementary and middle school, but "in high school he was able to attend the mainstream classes with the exception of [] one class[.]" (Tr. 66.) Castleberry characterized Buffington's ability to handle stress as "[v]ery poor unfortunately. He does not handle stress well." (Tr. 67.) Castleberry has observed that

> [Buffington's reaction to stress] can vary. Worst case scenario, he can become very agitated. He can have a real quick change in his mood where he become[s] agitated, fidgety. If it's a violent agitation, he can start yelling, become combative, threatening to hurt others, threatening to hurt himself. If it's sort of [a] nonviolent type of agitation, he can just become very nervous, a lot of anxiety and start shaking, trembling and kind of withdrawing.

(Tr. 67.) Castleberry indicated that Buffington tries to utilize deep breathing techniques to relieve some of his symptoms. (Tr. 67.)

According to Castleberry, the week before the hearing Buffington "threatened to hurt himself, pulled out a knife, had the

FINDINGS AND RECOMMENDATION     31

knife at his neck, [and] was talking about calling 911." (Tr. 69.)
Castleberry says Buffington "is concerned that maybe he shouldn't
be . . . on the streets . . . [and] should go back to the mental
hospital." (Tr. 69.)

Castleberry stated that Buffington usually will "go [to
school] three to four days out of a five-day week, but then in some
cases there would be maybe a week at a time that he wouldn't go to
school." (Tr. 69.)  Apparently, Buffington

> sometimes . . . would have legitimate health issues like
> having a bad cold or a bad flu and running a fever.  On
> other days, it would be as a result of anxiety. He would
> be very, very nervous or apprehensive about . . . an
> upcoming exam or he might have had a problem with a
> teacher or if he had failed to do his homework or
> something of that nature and he would get nervous. . . .
> Other times, he would be extremely tired and not be able
> to really get out bed in the morning.

(Tr. 69-70.)

Castleberry has observed that "the Abilify has been very
helpful . . . [with] anger outbursts but they're not totally
effective. He still complains to me about hearing a lot of
voices, . . . it seems like the medication is not really helping
him very much right now." (Tr. 70-71.)

At the conclusion of her hearing testimony, Castleberry
confirmed that Buffington graduated on time despite his
absenteeism. (Tr. 71.) Castleberry believes Buffington was able
to graduate because of his own perseverance, the fact that he is
"very bright," and since he "had a lot of help from his teachers."

FINDINGS AND RECOMMENDATION    32

(Tr. 71.)

### D.  Vocational Expert's Testimony

At the August 20, 2009 hearing, the ALJ also received testimony from a Vocational Expert ("VE"). (Tr. 72-82.) The ALJ asked the VE to consider a person of Buffington's "age, education and vocational background . . . [who] should be limited to simple repetitive tasks with simple instructions . . . [and] should be limited to no more than occasional contact with co-workers and the general public." (Tr. 76.) The VE stated that the jobs of collator and garment bagger existed in substantial numbers in the national economy. (Tr. 76-77.)

The ALJ asked the VE to consider the same hypothetical individual, but with the addition that the individual had no exertional limits. (Tr. 77.) The VE stated that this would not change his answer in anyway. (Tr. 77.)

The ALJ added to the hypothetical that "this person has a limitation to manipulation, that he can do no fine handling or fingering of objects." (Tr. 77.) The VE stated that "the two jobs previously identified would still exist . . . [because] those do not require fine manipulation." (Tr. 77.)

The ALJ then added to the hypothetical "the additional limitation that this person would have to have frequent access to a bathroom." (Tr. 78.) Because Buffington testified that he needs to use the restroom "about once an hour," the ALJ "defined frequent

FINDINGS AND RECOMMENDATION     33

as one time per hour for the purposes of the [] hypothetical." (Tr. 79.) In the VE's opinion, even if Buffington had to use the bathroom once every hour, he could still work as a collator or garment bagger. (Tr. 79-80.)

After the ALJ finished questioning the VE, Buffington's counsel asked the VE to add to the ALJ's hypothetical the "limitation that in response to constructive criticism by a supervisor this person would withdraw from the workplace due to anxiety symptoms or stress symptoms and probably would need between 20 or 30 minutes before they would be able to come back to the workplace to continue [] their job duty." (Tr. 81.) The VE stated, "[t]hat's [] considered a universal work expectation that an individual be able to accept constructive criticism. If that happens all the time, you know, obviously, again, in the unskilled work that I have identified, there is [a] production expectation. If he goes off and is away for 30 minutes, I don't think he would keep the job." (Tr. 81.)

### III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.   Child Disability Analysis Framework

"The Commissioner has established a three-step sequential evaluation process for determining if a child is eligible for SSI benefits." *Gille v. Astrue*, No. CV 10-705-PK, 2011 WL 4406317, at *1 (D. Or. June 16, 2011) (citing 20 C.F.R. § 416.924(a)). *Gille* summarized the three-step sequential evaluation as follows:

FINDINGS AND RECOMMENDATION    34

First, the ALJ must determine whether the child has engaged in substantial gainful activity (SGA). If so, the child is deemed not disabled and the inquiry ends. If the child has not engaged in SGA, then the ALJ must determine whether the child suffers from a severe impairment or combination of impairments that is severe. An impairment is not severe if it is a 'slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.' If the child does not have a severe impairment, the inquiry ends; if the child has a severe impairment, the evaluation proceeds to the third step. At the third and final step, the ALJ must determine whether the child's severe impairment meets, medically equals, or functionally equals, one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In making that determination, the ALJ considers all the relevant evidence in the case record, including objective medical evidence, relevant information from other sources, such as teachers, family members, or friends, and the claimant's statements, including statements from the child's parent(s) or caregivers. If the ALJ finds that the impairment meets or equals a listing, then the child is deemed disabled.

*Gille*, 2011 WL 3306317, at *1 (internal citations omitted).

### B.  Adult Disability Analysis Framework

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520)). The Keyser court described the five steps in the process as follows:

FINDINGS AND RECOMMENDATION    35

(1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)). The claimant bears the burden of proof for the first four steps in the process. If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the

FINDINGS AND RECOMMENDATION    36

Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony and also resolves any conflicts in the evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Ordinarily, the ALJ must give greater weight to the opinions of treating physicians, but the ALJ may disregard treating physicians' opinions where they are "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Id.* (citing *Matney, supra; Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). "[T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician. . . . [And,] the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) (citations and internal quotation marks omitted).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step

FINDINGS AND RECOMMENDATION     37

analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1281-82. If this . . . test is satisfied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms [only] with "specific findings stating clear and convincing reasons for doing so." *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

### C.   The ALJ's Decisions

### 1.  Childhood Decision

At the first step, the ALJ found Buffington had not engaged in substantial gainful activity. (Tr. 11.) At the second step, the ALJ found that Buffington's Schizoaffective Disorder and Anxiety Disorder were severe. (Tr. 12.) At the third step, the ALJ found that Buffington's combination of impairments did not meet or equal any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. (Tr. 12.) In particular, the ALJ found Buffington had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. (Tr. 20-22, 25.) The ALJ found Buffington had no limitations in the domains of moving about and manipulating objects and caring for himself. (Tr. 23-24.) Accordingly, the ALJ found that, prior to his 18th birthday, Buffington was not disabled under the Act.

FINDINGS AND RECOMMENDATION    38

(Tr. 25.)

**2. Adult Decision**

At the first step of the five-step sequential evaluation process, the ALJ found that Buffington had not engaged in substantial gainful activity since his 18th birthday. (Tr. 11, 25, 31.) At the second step, the ALJ found that Buffington's medical impairments of Schizoaffective Disorder and Anxiety Disorder were severe for the purposes of the Act. (Tr. 12, 25.) At the third step, the ALJ found that Buffington's combination of impairments were not the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. (Tr. 25.) The ALJ therefore assessed Buffington as having the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels but with the following non-exertional limitations. Claimant is limited to simple, repetitive tasks with simple instructions. No fine manipulation of small objects. Limited to no more than occasional contact with co-workers and the general public. Bathroom access once per hour.

(Tr. 29.) At the fourth step of the five-step process, the ALJ found that Buffington had no past relevant work. (Tr. 30.) At the fifth step, the ALJ found in light of Buffington's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform, including a collator and garment bagger. (Tr. 31.) Based on the finding that Buffington could perform jobs existing in

FINDINGS AND RECOMMENDATION     39

significant numbers in the national economy, the ALJ concluded that he was not disabled as defined in the Act from Buffington's 18th birthday through the date of the decision, September 22, 2009. (Tr. 31.)

### IV.  STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black v. Comm'r*, 433 Fed. Appx. 614, 615 (9th Cir. 2011). Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)). Instead, the court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the court may not substitute its

judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

### V.  DISCUSSION

#### A.  Rejection of Dr. Belcher's Opinion

Buffington first alleges that the ALJ improperly discounted the views of state agency examining psychiatrist Belcher, who concluded that Buffington's "intellectual functioning is in the extremely low range, resulting in a diagnosis of mild mental retardation." (Tr. 298.)  According to Belcher, there is a 95 percent probability that Buffington's true IQ lies between 60 and 68.  (Tr. 297.)  If credited, Buffington argues that Belcher's diagnosis compels a finding of disability under Listing 112.05D and/or Listing 12.05C.  (Pl.'s Br. at 17.)

Listing 112.05D is satisfied if there is "a valid verbal performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." *See* 20 C.F.R. § 404, Subpart P, Appendix 1, § 112.05.  Similarly, Listing 12.05 is satisfied when the claimant has "[a] valid verbal, performance, or full scale IQ of 60 though 70 and a physical or other mental impairment imposing an additional and significant *work-related* limitation of function[.]" *Id.* § 12.05C (emphasis added).

The ALJ is charged with resolving conflicting medical testimony. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

FINDINGS AND RECOMMENDATION     41

If there is conflicting medical testimony, the ALJ must provide specific and legitimate reasons, supported by substantial evidence, for rejecting the opinion of a medical expert. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (internal quotation marks omitted).

My review of the record persuades me that the ALJ provided specific and legitimate reasons for rejecting Belcher's opinion. *See Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995) (noting that conflicting medical testimony, combined with an ALJ's specific and legitimate reasons for disregarding the conflicting observations, opinions and conclusions of a physician, constitutes substantial evidence).

The ALJ first discounted Belcher's view because Buffington's presentation during the psychological assessment was inconsistent with the bulk of the objective medical evidence. *See Lester*, 81 F.3d at 831 (recognizing that specific and legitimate reasons can include results of psychological testing conducted by the examining psychologist that are suspect); *see also Oviatt v. Comm'r of Soc. Sec. Admin.*, 303 Fed. Appx. 519, 523 (9th Cir. 2008) (affirming an ALJ's decision to discredit IQ results based, in part, on the claimant's questionable effort and exaggeration of symptoms).

FINDINGS AND RECOMMENDATION    42

Substantial evidence in the record supports the ALJ's conclusion that Buffington's IQ test results were of questionable validity.   In the March 2002 Psychoeducational Assessment, Doryon described Buffington as a student of "high average cognitive ability" with "at least grade level performance in all academic areas," according to standardized testing.   (Tr. 261.) Doryon acknowledged Buffington's behavioral issues, but ruled out the possibility this was "primarily due . . . to mental retardation." (Tr. 261.) Holmes' October 2007 Mental Health Assessment described Buffington as "quite bright" and indicated that he was "maintaining a B+ average in the 11th grade."  (Tr. 333.)

With the exception of one class, Castleberry testified Buffington attended "mainstream classes" during high school.  (Tr. 66.) Castleberry also described Buffington as "very bright." (Tr. 71.)  During his senior year in high school, Buffington maintained a 2.35 cumulative grade point average and a class rank of 188 out of 320 students. (Tr. 172.)  Buffington's high school transcript indicates he received an A in "SS World Study" and several mixed choir classes; B's in Algebra 1 (during summer school), Spanish 1, General Biology, and tenth grade English; and C's in Zoology, American Studies, Pre-Algebra, Integrated Science, and ninth grade English.  (Tr. 172.)

Although Buffington has a history of participation in special education classes, the record suggests this is due to emotional

FINDINGS AND RECOMMENDATION    43

disturbance rather than cognitive deficit. (*See* Tr. 316) (noting that Buffington's IEP "is for Emotional Disturbance" and that he was on track "to graduate with a regular diploma.") Buffington's IEP instructor, Goldman, reported that Buffington "gets stuck a lot" in class; however, this "usually means [Buffington] is stressed out [and] doesn't want to do [] work." (Tr. 160.) As Goldman noted, Buffington "[r]arely will do work independently" and would rather have someone tell "him what to do every step of the way *even though he can do [it] on his own*." (Tr. 161) (emphasis added).

The ALJ also discredited Belcher's opinion based on the conflicting medical testimony provided by Lawrence. Lawrence found Belcher's conclusions to be a "grossly erroneous interpretation of [Buffington]'s cognitive abilities." (Tr. 19.) In Lawrence's opinion, Belcher "neglected to confirm a history of developmental delay and deficits of adaptive behavior before advancing the diagnosis of Mental Retardation. She merely cited the IQ scores, as if no other confirming evidence was required." (Tr. 304.) After considering the entire record, including Buffington's "longitudinal records of mental health treatment" and school transcripts, Lawrence opined that Buffington behaved inconsistently during Belcher's examination. (Tr. 19.)

As the ALJ noted, unlike Belcher,[11] Lawrence "considered the records of evidence and offered reasonable explanations and conclusions." (Tr. 19.)  I conclude that this was a specific and legitimate reason for rejecting Belcher's opinion in favor of Lawrence's. *See Gray v. Comm'r of Sec. Sec. Admin.*, 365 Fed. Appx. 60, 62 (9th Cir. 2010) (concluding that the ALJ provided a specific and legitimate reason for rejecting one physician's opinion in favor of another because the accepted physician's opinion took into consideration additional evidence, such as the claimant's medical records and high school transcript).

In sum, the ALJ came to a reasonable conclusion based on the evidence in the record regarding Belcher's opinion. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("If the record would support more than one rational interpretation, we defer to the ALJ's decision.")

### B.  Rejection of Dr. Vergamini's Opinion

Buffington argues that the ALJ erred by failing to provided clear and convincing reasons for rejecting the opinion of his treating psychiatrist.

In July of 2009, Buffington's counsel sent Vergamini a letter asking him to comment on Buffington's present status and functional

---

[11]    It does not appear that Belcher had the benefit of reflecting on the extensive record that was before the ALJ or Lawrence. (*See* Tr. 293) ("The report of this interview is based solely on the client's self-report, one psychiatrist's note, and a brief conversation with the client's mother.")

capacity limitations.  (Tr. 393.)  In particular, within the July

2009 letter Buffington's counsel stated:

> Ultimately, I believe the question in Mr. Buffington's
> case will come down to whether he could sustain a simple
> routine, low stress job, that does not require him to
> come into contact with the public and does not require
> him to work in close coordination with supervisors or co-
> workers.  The main requirement of such a job is that he
> be present full-time, eight hours per day, five days per
> week without special accomodations, or without excessive
> absences from work.  Excessive absences from work is
> defined as absences greater than two days per month.  Is
> there anything about Mr. Buffington's condition, and the
> symptoms that he is experiencing that would interfere
> with his ability to sustain this type of activity?

(Tr. 394.)  In response, Vergamini said he doubted "if [Buffington]

could maintain 8hours/day 5days/week without *some* accomodations or

absences." (Tr. 394) (emphasis added).

A treating physician's medically supported opinion regarding

the nature and severity of a claimant's impairments is generally

given great weight.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir.

2007); 20 C.F.R. § 404.1527(d)(2).  Even if a treating physician's

opinion is contradicted, the ALJ may disregard it only by setting

forth specific and legitimate reasons supported by substantial

evidence in the record for doing so.  *Tonapetyan*, 242 F.3d at 1148.

Here, the ALJ assigned Vergamini's opinion little weight

because it was "inconsistent with his own treatment notes." (Tr.

29.)  As the ALJ noted, Vergamini stated Buffington "might be able

to function in school," yet Buffington had already been functioning

in school and, in fact, was mainstreamed for a majority of the day

and received a regular diploma.  (Tr. 29.)

An ALJ may reject a treating medical opinion that is inconsistent with the physician's own treatment notes.  *Paulson v. Astrue*, 368 Fed. Appx. 758, 760 (9th Cir. 2010) ("The ALJ properly discredited [the physicians]'s opinion because it was inconsistent with [his] own prior treatment notes, including those indicating that [the claimant]'s subjective symptoms could not be explained by objective medical evidence.")  However, contrary to the ALJ's contentions, Vergamini's opinion is not necessarily inconsistent with his treatment notes.  At the time Vergamini issued his opinion, Buffington had recently graduated and was planning on attending a community college in the fall of 2009. Given the accomodations and support Buffington received in high school, it seems likely Vergamini was expressing uncertainty whether Buffington could function, either in the full-time workplace or at the community college level, without the accomodations and support he enjoyed at high school.  This does not conflict with anything the court sees in Vergamini's treatment notes.

The ALJ failed to identify what, if anything, in Vergamini's treatment notes conflicts with his opinion he was uncertain Buffington would be able to work absent special accomodations. Although a medical source opinion about whether a claimant is "disabled" or "unable to work" is an administrative finding ultimately reserved for the Commissioner, the treater's opinion on

the issue cannot be disregarded and must be considered.
*Katzenberger v. Astrue*, Civ. No. 10-6029-CL, 2011 WL 4381574, at
*10 (D. Or. July 26, 2011).

In summary, I conclude that the reason given by the ALJ for
discounting Vergamini's opinion was insufficient.

### C. Adverse Credibility Determination

Buffington also argues that the ALJ improperly discredited his
symptom testimony. Under Ninth Circuit case law,

> [w]ithout affirmative evidence showing that the claimant
> is malingering, the Commissioner's reasons for rejecting
> the claimant's testimony must be clear and convincing. If
> an ALJ finds that a claimant's testimony relating to the
> intensity of his pain and other limitations is
> unreliable, the ALJ must make a credibility determination
> citing the reasons why the testimony is unpersuasive. The
> ALJ must specifically identify what testimony is credible
> and what testimony undermines the claimant's complaints.
> In this regard, questions of credibility and resolutions
> of conflicts in the testimony are functions solely of the
> Secretary.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir.
1999) (citations omitted). The ALJ met this standard here.

The ALJ found Buffington's statement concerning the intensity,
persistence and limiting effects of his symptoms not entirely
credible. In weighing a claimant's credibility, an "ALJ may
consider his reputation for truthfulness, inconsistencies either in
his testimony or between his testimony and his conduct, and
testimony from physicians and third parties concerning the nature,
severity, and effect of the symptoms of which he complains." *Light
v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

FINDINGS AND RECOMMENDATION    48

The ALJ made specific findings in support of his decision to discount Buffington's testimony, noting, *inter alia*, that: (1) Buffington's hearing testimony was inconsistent with the objective medical evidence that indicated his medication helped alleviate stress and other symptoms associated with his mental impairments; (2) Buffington recently graduated and was preparing to attend community college, despite the alleged intensity and persistence of his stress and anxiety; (3) treatment notes reflected that Buffington had been avoiding and/or denied experiencing psychotic symptoms; and (4) Holmes' 2006 Mental Health Assessment indicated that treating psychiatrist Freedman "reported that [Buffington]'s self-reported hallucinatory activities did not appear to be true hallucinations," yet Buffington "and his mother continued to be strongly invested in [Buffington] being an individual with 'psychosis,' which is to say a person with severe and persistent mental illness." (Tr. 348.)

In sum, I conclude that the ALJ articulated acceptable reasons for discounting Buffington's testimony which are supported by ample evidence in the record.

### D. Vocational Expert Hypothetical

Buffington contends that, if this case is not reversed for payment based upon the first three arguments, then this case should be remanded for further proceedings because the VE hypothetical did not contain the ALJ's own finding that Buffington suffers moderate

FINDINGS AND RECOMMENDATION    49

difficulties in maintaining concentration, persistence or pace. The Commissioner argues that the ALJ's hypothetical question "reflected all of [Buffington]'s credible limitations." (Def.'s Br. at 11.)

"Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir 1988). In his written decision, the ALJ stated, "[t]he record indicates claimant has moderate difficulties in maintaining concentration, persistence, or pace." (Tr. 26.) But the ALJ did not account for these nonexertional limitations when he posed hypothetical questions to the VE about the type of work that Buffington was able to perform. (*See* 76-81.) This oversight was error. *See Williamson v. Comm'r of Soc. Sec.*, 438 Fed. Appx. 609, 612 (9th Cir. 2011) (finding the same omission to be reversible error).

Accordingly, this case should be remanded to the Commissioner for further administrative proceedings. In those proceedings, the ALJ must include Buffington's concentration, persistence, and pace limitations in the questions posed to the VE. Depending on the circumstances, it may also be appropriate for the ALJ to include limitations regarding Buffington's absenteeism. During the August 20, 2009 hearing, Buffington's counsel inquired as to acceptable absentee rates in the workplace; however, it does not appear that this limitation was specifically incorporated into any of the VE hypotheticals. (*See* Tr. 80-81.) In light of the Teacher

FINDINGS AND RECOMMENDATION    50

Questionnaire of September 19, 2008, completed at the beginning of Buffington's senior year by Phyllis Goldman, his teacher of some two years, where Goldman notes an "unusual degree of absenteeism," (Tr. 160-67) and the testimony of Buffington (missed school at least three times a month, Tr. 60) and Castleberry (Buffington will "go [to school] three to four days out of a five-day week," Tr. 69), the VE should address the issue of absenteeism because Buffington's school environment was significantly more supportive than a typical work environment.

## VI.   CONCLUSION

For the foregoing reasons, I recommend that the decision of the Commissioner regarding Claimant be **REVERSED** and **REMANDED** for further proceedings consistent with this Findings and Recommendation and the parameters provided herein.

## VII.   SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **March 12, 2012.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due **March 20, 2012.** When the response is due or filed,

FINDINGS AND RECOMMENDATION      51

whichever date is earlier, the Findings and Recommendation will go

under advisement.

Dated this <u>27th</u> day of February, 2012.

/s/ Dennis James Hubel
_____

Dennis James Hubel
Unites States Magistrate Judge

FINDINGS AND RECOMMENDATION      52